**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES ZILINSKY, GERALDINE ZILINSKY, CORY SIMPSON, MEAGAN McGINLEY, SANDRA GARRETTDORSEY, BRIAN DERING, THERESA DERING, ALAN ARMSTRONG, and SANDY ARMSTRONG, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) | CASE NO. 2:20-cv-6229-MHW-KAJ<br><br>JUDGE MICHAEL H. WATSON<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT WITH JURY DEMAND** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| LEAFFILTER NORTH, LLC, | ) ) | |
| Defendant. | ) ) | |

Plaintiffs James Zilinsky, Geraldine Zilinsky, Cory Simpson, Meagan McGinley, Sandra GarrettDorsey, Brian Dering, Theresa Dering, Alan Armstrong, and Sandy Armstrong (collectively, "Plaintiffs") file this First Amended Class Action Complaint on behalf of themselves and all others similarly situated, by and through the undersigned attorneys, against LeafFilter North, LLC ("LeafFilter North" or "Defendant") and state as follows:

**NATURE OF THE ACTION**

1.      This is an action on behalf of Plaintiffs and a class of all other similarly situated persons or entities against Defendant, the distributor of a defective gutter protection system known as LeafFilter, which is designed, marketed, and sold at a significant premium as a low to no maintenance alternative to traditional gutter cleaning devices and systems. In reality, LeafFilter possesses a latent defect that prevents substantial amounts of rainwater from passing through the LeafFilter system and instead causes (1) rainwater to flow over the top of the LeafFilter system

and gutters; and (2) debris to accumulate on top of the LeafFilter system that must be cleaned off by the homeowner. The defect renders the product unfit for its intended purpose as it substantially reduces the ability of water to enter the gutters on which it is installed.

2.      Defendant never discloses in its uniform online and print marketing materials that the installation of LeafFilter reduces the amount of rainwater that can enter the gutters from the roof and permits debris to accumulate on top of the LeafFilter system. To the contrary, Defendant touts that LeafFilter "allows as much water as an open gutter." As a result, Plaintiffs and the putative class members are deceived into purchasing LeafFilter not knowing that its installation would cause substantial amount of rainwater to run over top of the gutters and/or require debris to be cleaned from the top of the LeafFilter system.

3.      Defendant has known for years, and actively concealed, that LeafFilter is defective and causes overflow and accumulating debris.  Many consumers have filed or posted complaints with the Better Business Bureaus, with their respective state Attorney General, or with various consumer review websites regarding the overflow and/or debris caused by LeafFilter. Had Defendant disclosed the defect, Plaintiffs and class members would have negotiated a lower price to reflect the defect or simply avoided the defect altogether by not purchasing LeafFilter. Instead, due to Defendant's deceptive marketing materials, Plaintiffs and class members paid more for LeafFilter based on Defendant's promise that rainwater from their roofs would flow freely and easily through the LeafFilter system, and that they would never have to clean debris from the LeafFilter system because: "When our ladder goes up, yours goes down forever."[1]

---

[1] https://www.leaffilter.com/why-gutter-guards/gutter-cleaning/ (site last visited 12/2/20).

2

## PARTIES

4.      Plaintiff, James Zilinsky is and was an individual resident of Will County, Illinois, and an Illinois citizen at all times relevant to this action.

5.      Plaintiff, Geraldine Zilinsky is and was an individual resident of Will County, Illinois, and an Illinois citizen at all times relevant to this action.

6.      Plaintiff Cory Simpson is and was an individual resident of Montgomery County, Maryland and a Maryland citizen at all times relevant to this action.

7.      Plaintiff Meagan McGinley is and was an individual resident of Montgomery County, Maryland and a Maryland citizen at all times relevant to this action.

8.      Plaintiff Sandra GarrettDorsey is and was an individual resident of Absecon, New Jersey and a New Jersey citizen at all times relevant to this action.

9.      Plaintiff Brian Dering is and was an individual resident of Dingmans Ferry, Pennsylvania and a Pennsylvania citizen at all times relevant to this action.

10.      Plaintiff Theresa Dering is and was an individual resident of Dingmans Ferry, Pennsylvania and a Pennsylvania citizen at all times relevant to this action.

11.      Plaintiff Alan Armstrong is and was an individual resident of Washougal, Washington and a Washington citizen at all relevant times to this action.

12.      Plaintiff Sandy Armstrong is and was an individual resident of Washougal, Washington and a Washington citizen at all times relevant to this action.

13.      Defendant LeafFilter North, LLC is and was an Ohio limited liability company headquartered in Ohio at all times relevant to this action.

## JURISDICTION AND VENUE

14.     The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332(d), because there are at least 100 putative class members, the combined value of the claims of proposed Class exceeds $5,000,000, exclusive of interest and costs, and at least one Class member is a citizen of a state other than Defendant's state of citizenship, Ohio.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant is a corporation subject to personal jurisdiction in this District and is therefore deemed to reside in this District for the purposes of venue. Defendant's website's terms of use, to which Plaintiffs are subject, states, "Any legal action or proceeding relating to your access to or use of the Site or Materials shall be instituted in a state or federal court in the State of Ohio. You and LeafFilter North.com agree exclusively and irrevocably to submit to the jurisdiction of, and agree that venue is proper in, these courts in any such legal action of proceeding."

16.     This Court possesses personal jurisdiction because Defendant regularly conducts business, marketing, distributing, promoting and/or selling, either directly or indirectly through third parties or related entities, from its headquarters in Ohio. Defendant has obtained the benefits of the laws of Ohio and profited handsomely from Ohio commerce.

## FACTUAL ALLEGATIONS

A.      **LeafFilter North**

17.     Defendant is the exclusive distributor of the LeafFilter system, which Defendant markets as a guttering system for residential and commercial buildings that permits rainwater but not leaves and other debris to flow through the LeafFilter, thereby preventing clogged gutters.

18.     Defendant's website represents that it is "The Nation's Largest Gutter Protection Company" and "America's #1 Professionally Installed Gutter Guard."[2]

19.     LeafFilter North is based in Hudson, Ohio, but maintains locations in 42 states and the District of Columbia. Upon information and belief, all 42 LeafFilter locations are owned, dominated, and/or controlled by Defendant, and act as agents of Defendant by selling and installing LeafFilter products. Indeed, Defendant emphasizes that it is the "single point of contact for sales and service" with "no middle man" or "independent dealer network": "We are the only installer of LeafFilter™ in the United States, providing homeowners with one single point of contact for sales and service. By not relying on an independent dealer network, we are able to maintain a high level of quality control and service. And, since there is no middle man, we pass the savings on to you!"[3]

20.     According to Secretary of State records, Defendant's owner and founder, Matthew Kaulig, also serves as President of each of the following 24 state LeafFilter locations: Alabama, Connecticut, Florida, Georgia, Illinois, Iowa, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nevada, New Jersey, New York, North Carolina, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, Washington, and Wisconsin.[4]

---

[2] https://www.leaffilter.com/ (site last visited 12/2/20).

[3] https://www.leaffilterguards.com/content_split_test?Source=RC&mb=1020&id=10294d7e5bec5009f6993e7ec672 (site last visited 12/2/20).

[4] For the remaining 18 states in which it operates, Defendant either registers a neighboring state's office with the Secretary of State (i.e., the Missouri office is registered with the Kansas Secretary of State and operates in Kansas), registers LeafFilter North with the Secretary of State (Arkansas, California, Delaware, Idaho, Indiana, Louisiana, Maine, Nebraska, Oklahoma, Utah, and West Virginia), registers both LeafFilter North and a neighboring state's office (Mississippi and Rhode Island), or fails to register at all (New Hampshire, Vermont, and Wyoming). Regardless of where or how these entities are registered, they list the same address for their principal office – 1595 Georgetown Rd., Hudson, OH 44236.



21.     Defendant markets the LeafFilter product on its website www.leaffilter.com and obtains online traffic through a targeted online advertising campaign. Defendant particularly targets elderly individuals who lack the physical ability to clean their own gutters of leaves and debris and are at heightened risk of falling.  Defendant's website specifically warns that 164,000 injuries and 300 deaths occur each year from ladder accidents.[5]

22.     Defendant promotes the LeafFilter system by offering a fully transferrable, lifetime, money back, no clog guarantee.  To activate that warranty, customers are required to visit Defendant's website and register the warranty by entering their name and job number.

23.     By virtue of accessing and using Defendant's website, consumers agree to the website's "Terms of Use," which include a choice-of-law provision and a forum selection clause:

---

[5] https://www.leaffilter.com/why-gutter-guards/gutter-cleaning/  (site last visited 12/2/20).

"By using this Site, you expressly agree that your rights and obligations shall be governed by and interpreted in accordance with the laws of the State of Ohio, excluding its choice of law rules. Any legal action or proceeding relating to your access to or use of the Site or Materials shall be instituted in a state or federal court in the State of Ohio."[6]

24.     Defendant further markets the LeafFilter system through mailed leaflets and newspaper advertisements that drive consumers to Defendant's website.

25.     No matter which media form Defendant employs to contact consumers, its representations regarding the LeafFilter system remain uniform.

26.     When a consumer contacts Defendant through its website or phone number, Defendant sends a sales representative from one of its locations to the consumers' home.

27.     Defendant's sales representative then provides Defendant's standard form marketing brochures to entice the consumer to purchase the LeafFilter system.

28.     Defendant advertises that its installers will "clean and realign your gutters prior to installing our gutter guard, so you never have worry about weighing the costs of cleaning again. When our ladder goes up, yours goes down forever."[7]



29.     As of December 2020, Defendant's website boasts 668,750 customers purchased LeafFilter from "coast to coast" and exactly 0 gutters clogged.[8]

---

[6] https://www.leaffilter.com/terms-of-use/ (site last visited 12/2/20).
[7] https://www.leaffilter.com/why-gutter-guards/gutter-cleaning/ (site last visited 12/2/20).
[8] https://www.leaffilter.com/ (site last visited 12/2/20).

**B.     What is the LeafFilter System?**

30.     According to Defendant's website, LeafFilter as a patented 3-piece system that effectively accepts and manages water while shedding debris.[9]

31.     The first piece of the 3-piece system is the Micromesh, which Defendant describes as follows:

> To protect your gutters from debris, LeafFilter's micromesh screen is made out of a surgical grade stainless steel which will never rust or corrode. Plus, at only 275 microns fine, not even shingle grit will get through our micromesh.[10]



32.     The second piece of the 3-piece LeafFilter system is the uPVC frame:

> LeafFilter is made of a durable uPVC material that will never warp or deteriorate. Plus, with a built-in pitch, your gutter protection is installed at the optimal angle to shed debris.[11]



33.     The third and final piece of the LeafFilter system is the structural hangers:

---

[9] https://www.leaffilter.com/why-leaffilter/leaffilter/ (site last visited 12/2/20).

[10] https://www.leaffilter.com/why-leaffilter/leaffilter/ (site last visited 12/2/20).

[11] https://www.leaffilter.com/why-leaffilter/leaffilter/ (site last visited 12/2/20).

Your gutter system will be stronger than ever before thanks to internal hidden hangers, securely fasted into your fascia board.[12]



## C. Defendant Fails to Disclose LeafFilter Substantially Reduces the Ability of Rainwater to Enter the Existing Gutter System

34.     Nowhere in its marketing materials does Defendant disclose that the LeafFilter system substantially reduces the gutters' ability to manage moderate and heavy rains.

35.     In its uniform online marketing materials provided to consumers in all states, Defendant fails to disclose that the LeafFilter reduces the ability of an existing gutter system to handle rainwater and instead represents:

Can LeafFilter Handle Heavy Rains?

Yes, absolutely. Our gutter guards are installed across America—including in areas with torrential downpours and hurricanes![13]

36.     In another online advertisement, Defendant provides the following representation:

"What if leaves & debris simply pile up on top of LeafFilter?"

LeafFilter is installed at an angle so debris slides right off, never builds up on top of the filter guards and **stops water from overshooting the gutter**.[14]

37.     Further, Defendant represents the following in bold font:

**Works in Heavy Rain.**[15]

---

[12] https://www.leaffilter.com/why-leaffilter/leaffilter/(site last visited 12/2/20).
[13] https://www.leaffilterguards.com/content_split_test?Source=RC&mb=1020&id=10294d7e5bec5009f6993e7ec672 46 (site last visited 12/2/20).
[14] https://www.leaffilterguards.com/content_split_test?Source=RC&mb=1020&id=10294d7e5bec5009f6993e7ec672 46 (site last visited 12/2/20) (emphasis added).
[15] https://www.leaffilterguards.com/content_split_test?Source=RC&mb=1020&id=10294d7e5bec5009f6993e7ec672 46 (last visited 12/2/20) (emphasis in original).

38.     Defendant's website encourages consumers to purchase the LeafFilter system to "Avoid Water Damage To Your Home"[16] and further explains, "LeafFilter installs directly on your existing gutters to bring you permanent peace of mind and help prevent damages related to clogged gutters. **Nothing but water will enter your gutters—guaranteed!**"[17]

39.     Under the heading "How Does LeafFilter Handle Water?" Defendant's website states, "LeafFilter's patented 3-piece micromesh system will effectively accept and manage water without collecting any debris" for three reasons: (1) surface tension, (2) built-in pitch, and (3) damage control.[18]

40.     First, for surface tension, Defendant explains:

As water flows over LeafFilter's micromesh, surface tension draws the liquid through the micromesh and into your gutter.[19]



41.     Second, Defendant asserts that a built-in pitch manages water flow:

LeafFilter is designed with an angle that allows it to shed debris while accepting water.[20]

---

[16] https://www.leaffilter.com/why-leaffilter/leaffilter/ (site last visited 12/2/20).
[17] https://www.leaffilter.com/why-leaffilter/leaffilter/ (site last visited 12/2/20) (emphasis added).
[18] https://www.leaffilter.com/why-leaffilter/leaffilter/ (site last visited 12/2/20).
[19] https://www.leaffilter.com/why-leaffilter/leaffilter/ (site last visited 12/2/20).
[20] https://www.leaffilter.com/why-leaffilter/leaffilter/ (site last visited 12/2/20).



42.     Defendant also asserts that:

Our system is completely sealed and durable, allowing it to keep debris out of your gutter and withstand the weight of sticks, twigs, and pests.[21]



43.     Additionally, Defendant's website proclaims that LeafFilter keeps everything out of your gutter—except for water:

LeafFilter's award-winning and patented technology is scientifically designed to keep everything out of your gutters—except for water. LeafFilters screen is fine enough to keep out even the smallest of debris, including: dirt, pollen, shingle grit, and pine needles.[22]

---

[21] https://www.leaffilter.com/why-leaffilter/leaffilter/ (site last visited 12/2/20).
[22] https://www.leaffilter.com/why-leaffilter/leaffilter/ (site last visited 12/2/20).

44.     Defendant further asserts the LeafFilter is "100% effective. With no holes, gaps, or large openings, LeafFilter keeps out all types of debris including, pine needles, shingle grit, seed pods, and more! Nothing but water will enter your gutters- guaranteed."[23]

45.     Defendant's website also compares the LeafFilter to other gutter guards on the market, and proclaims that only the Leaf Filter "allows as much water as an open gutter":[24]

|  | LeafFilter | Brush | Foam | DIY Screen | Micro-Mesh | Hood |
|---|---|---|---|---|---|---|
| Keeps out ALL debris | ✓ |  |  |  |  |  |
| Permanently Eliminates the Need for Gutter Cleaning | ✓ |  |  |  |  |  |
| Allows as Much Water as an Open Gutter | ✓ |  |  |  |  |  |

46.     The LeafFilter sales brochure that Defendant provides to its locations to present to Plaintiffs and class members similarly fails to disclose the water runoff defect.

47.     Instead, the brochure boasts that "LeafFilter will help protect your home & prevent these costly repairs" and then lists "erosion, soffit/fascia rot, flooded basement, and ice dams."

**D.      Plaintiffs' Experiences with LeafFilter**

**JAMES AND GERALDINE ZILINSKY (the "Zilinsky Plaintiffs")**

48.     Throughout early 2020, the Zilinsky Plaintiffs researched and compared the advantages and disadvantages of different gutter systems.  They wanted a gutter system because their age prevented them from physically cleaning their gutters as they had done in the past.

49.     Prior to purchasing the LeafFilter product, the Zilinsky Plaintiffs reviewed Defendant's marketing materials (including its website) stating, inter alia, that rainwater would

---

[23] https://www.leaffilter.com/why-gutter-guards/gutter-cleaning/ (site last visited 12/2/20).
[24] https://www.leaffilter.com/why-leaffilter/compare/ (site last visited 12/2/20).

pass through the LeafFilter system and not not flow over the top, and that the LeafFilter system would not allow debris to accumulate. At no point were the Zilinsky Plaintiffs informed about any defects associated with the LeafFilter system that allow substantial amounts of rainwater to overflow the gutters and debris to accumulate.

50. In April 2020, after reviewing Defendant's marketing materials on its website and a newspaper article in a local newspaper, the Zilinsky Plaintiffs called Defendant's phone number to schedule a time to have Defendant's Illinois sales agent come to the Zilinsky Plaintiffs' home.

51. On or around April 21, 2020, the Zilinsky Plaintiffs purchased the LeafFilter system from Defendant's Illinois location, LeafFilter North of Illinois, LLC, for $3,200. At the time of purchase, on the basis of Defendant's representations, the Zilinsky Plaintiffs purchased the LeafFilter system, believing it to be of premium quality and worthy of the high price.

52. Unbeknownst to the Zilinsky Plaintiffs, the LeafFilter system was and is defective in that it (1) allows rainwater to flow over the top of the LeafFilter system; and (2) allows debris to accumulate on top of the LeafFilter system.

53. After their purchase, the Zilinsky Plaintiffs registered their warranty on Defendant's website.[25]

54. The characteristics of the above-described LeafFilter defect were present in the LeafFilter system when the product left the factory.

55. On or around April 22, 2020, Defendant's Illinois location (and agent) installed the LeafFilter system on the Zilinsky Plaintiffs' home.

56. On or around May 1, 2020, after a night of moderate to heavy rain, the Zilinsky Plaintiffs noticed that a substantial amount of the mulch landscaping material surrounding their

---

[25] https://www.leaffilter.com/register#step1 (last visited 12/2/20).

home was washed up.  The newly installed LeafFilter system caused rainwater to overflow the gutters, rather than go into and through the gutters themselves as Defendant advertised.  This overflow had never happened before in the approximately ten years the Zilinsky Plaintiffs had lived in their home prior to the LeafFilter installation.

57.     Additionally, the rainwater overflow caused the Zilinsky Plaintiffs' home foundation, patio, pergola wooded roof, cement walkway, and porch foundation to become saturated as if their home were without any gutter system whatsoever.

58.     Immediately, on May 1, 2020, the Zilinsky Plaintiffs called Defendant's customer service and support number (800-749-4566) to report the overflow issue. Zachariah Mott, Defendant's Illinois Location's Assistant Installer Manager, subsequently visited the Zilinsky Plaintiffs' home to inspect the LeafFilter system and told the Zilinsky Plaintiffs that the LeafFilter system would need to be removed and reinstalled to fix the overflow problem.  However, Mr. Mott did not actually perform the repairs.

59.     Weeks passed but no progress was made on the supposedly necessary "reinstallation" needed to fix the overflow problem.

60.     On May 15, 2020, the Zilinsky Plaintiffs received a call from Defendant's employee, Alana, who for the first time, told the Zilinsky Plaintiffs **that the LeafFilter system would not work during heavy rain**.

61.     On June 8, 2020, Defendant's employee, Tracy Blake, sent Plaintiffs an email stating that based on pictures of the Zilinsky Plaintiffs' gutters and inspection notes, Defendant had identified a possible solution for the overflow problem with the LeafFilter system: lowering all gutters on the home.  This process would require the gutters to be removed entirely and reinstalled at a lower point on the fascia of the home.

62.     The Zilinsky Plaintiffs subsequently contacted Naperville Exterior, Inc., an independent roof/gutter company, to have them assess their gutters and Defendant's recommended solution.

63.     On June 13, 2020, Naperville Exterior sent the Zilinsky Plaintiffs a letter stating:

> Thanks for contacting Naperville Exterior in regards to your gutter issue. After inspecting the gutters we have found that the pitches are ok and there is nothing wrong with the gutters. Also to your question on "is it ok to lower gutters"? Our answer to that is NO. Gutters should not be lowered because of the gutter flashing. Gutter flashing goes on the roof 3 ½" and down into the gutter 2 ½". Gutters are to be placed at the highest point, and then pitched down from there but can not be pitched any lower then 2 ½". If lowered then you defeat the purpose of gutter flashing that protects the fascia board.
> Thanks again for contacting us and I hope I have answered your concerns.

64.     Based on the recommendation of Naperville Exterior, the Zilinsky Plaintiffs rejected Defendant's proposal of lowering all the gutters on their home because doing so could damage the facia board and/or other components of their home.

65.     The Zilinsky Plaintiffs hired Naperville Exterior Inc. to remove the LeafFilter system from their gutters, paying $375 out-of-pocket to do so. The LeafFilter system was not damaged during the removal process and is currently being stored in the Zilinsky Plaintiffs' garage.

66.     The LeafFilter defect, as well as Defendant's failure to disclose the defect to consumers, has caused the Zilinsky Plaintiffs and class members to suffer ascertainable harm including, but not limited to, the purchase price of LeafFilter system or, alternatively, the difference in value between the LeafFilter system as advertised and the LeafFilter system as actually sold.

67.     Had Defendant disclosed that the LeafFilter system was defective and caused rainwater to overflow during moderate to heavy rains, the Zilinsky Plaintiffs would not have purchased the LeafFilter system or would have paid substantially less for the product.

**CORY SIMPSON AND MEAGAN McGINLEY (the "Simpson/ McGinley Plaintiffs")**

68.     Cory Simpson and Meagan McGinley are husband and wife and live in Silver Springs Maryland.

69.     The Simpson/ McGinley Plaintiffs paid $3,632 to have the LeafFilter system installed on their home on November 12, 2020.  The Simpson/ McGinley Plaintiffs subsequently registered their warranty on Defendant's website.

70.     Prior to purchasing the LeafFilter system, the Simpson/ McGinley Plaintiffs researched the LeafFilter system on LeafFilter.com.  A salesman came out to their home on November 7, 2020 and made a standardized sales pitch using Defendant's sales materials.  Meagan specifically asked the salesman about how the LeafFilter system would perform during periods of ice and snow.  This is a topic that Defendant addresses on its website.[26]  The salesman said that they would experience no issues with ice and snow beyond what they would with a regular gutter.  The Simpson/ McGinley Plaintiffs had lived in their home for approximately five years prior to the installation of the LeafFilter system and had not experienced any issues with ice or snow in all that time.  Meagan also asked about ice dams.  Again, the salesman said this would not be a problem, as reflected on Defendant's website.[27]

71.     Prior to purchasing the LeafFilter system, the Simpson/ McGinley Plaintiffs also viewed Defendant's marketing materials (including on its website) stating, inter alia, that rainwater would pass through the LeafFilter system and not flow over the top, and that they would never have to clean debris from the LeafFilter system because: "When our ladder goes up, yours goes

---

[26] https://www.leaffilter.com/blog/home-exteriors/roofing-gutters/keep-gutters-flowing-winter/ (last visited 12/2/20)
[27] https://www.leaffilter.com/blog/home-exteriors/ice-dams-101/ (last visited 12/2/20);
https://www.leaffilter.com/blog/how-to-repairs/money-finances-tips-tricks/put-in-the-work-now-to-avoid-ice-damming/ (last visited 12/2/20).

16

down forever." At no point were the Simpson/ McGinley Plaintiffs informed about any defects associated with the LeafFilter system that allow substantial amounts of rainwater to overflow the gutters and debris to accumulate.

72.     At the time of the purchase, on the basis of Defendant's representations, the Simpson/ McGinley Plaintiffs believed the LeafFilter system to be of premium quality and worthy of the high price.

73.     Unbeknownst to the Simpson/ McGinley Plaintiffs, the LeafFilter system was and is defective in that it (1) allows rainwater and melting ice and snow to flow over the top of the LeafFilter system; and (2) allows debris to accumulate on top of the LeafFilter system.

74.     The characteristics of the above-described LeafFilter defect were present in the LeafFilter system when the product left the factory.

75.     Within the first month after installation, Cory noticed that pine needles were sticking in the LeafFilter system in a section of the gutter that was visible from their bedroom. He got up on a ladder and cleaned them off, despite having been told he would never have to get up on a ladder again to clean the gutters.

76.     One day while Meagan was doing laundry in the basement, she noticed that water was pouring in through the foundation. Cory went out to look and saw that rain from the roof was passing right over top of the LeafFilter system and down onto the ground near their foundation. The LeafFilter mesh had frozen over and water was simply passing over top of it. Cory and Meagan (who was pregnant at the time) took a tarp outside to try and keep the water from entering the basement. Since then, the Simpson/ McGinley Plaintiffs noticed that this problem occurs not just during rain, but also as snow melts on their roof faster than the ice melts on top of the LeafFilter system.

77.     The Simpson/ McGinley Plaintiffs emailed Defendant (support@leaffilter.com) seeking help.  Specifically, they wanted a refund and the product removed from their home.  Defendant refused, saying it never does that.  Nevertheless, a salesman contacted the Simpson/ McGinley Plaintiffs after seeing their email and said he would come out to their home to remove the system, but he never did.

78.     To avoid the worst of the issues, Cory removed two sections of the LeafFilter system himself.  Once he did so, the water immediately started flowing into the gutters again.  He decided that it would be best to have the remainder of the LeafFilter system removed as well, so Cory contacted Defendant to inform them of his plans.  Cory corresponded with Bob Haire of leaffilter.com.

79.     On December 23, 2020, a LeafFilter representative came out to the Simpson/ McGinley Plaintiffs' home to inspect the system and take photographs.

80.     On December 26, 2020, the Simpson/ McGinley Plaintiffs had the LeafFilter system removed from their home and placed in their garage.

81.     Since the LeafFilter system was removed from their home, and despite considerable snow, ice, and rain, the Simpson/ McGinley Plaintiffs have not had any problems with water overflowing their gutters.

82.     The LeafFilter defect, as well as Defendant's failure to disclose the defect to consumers, has caused the Simpson/ McGinley Plaintiffs and class members to suffer ascertainable damages including, but not limited to, the purchase price of LeafFilter system or, alternatively, the difference in value between the LeafFilter system as advertised and the LeafFilter system as actually sold.

83.     Had Defendant disclosed that the LeafFilter system was defective and caused rainwater to overflow during moderate to heavy rains, the Simpson/ McGinley Plaintiffs would not have purchased the LeafFilter system, or would have paid substantially less for the product.

**SANDRA GARRETTDORSEY ("Plaintiff GarrettDorsey")**

84.     Plaintiff GarrettDorsey paid approximately $5,000 to have the LeafFilter system installed on her home in or about August or September 2020.  Plaintiff GarrettDorsey subsequently registered her warranty on Defendant's website.

85.     Prior to purchasing the LeafFilter system, Ms. GarrettDorsey saw LeafFilter advertising on television and reviewed a LeafFilter brochure she received in the mail.  Ms. GarrettDorsey also investigated gutter protection systems on the internet and visited and reviewed Defendant's website.  Based upon the representations that LeafFilter's system was rated #1 and that she would never have to get up on a ladder again to clean her gutters, she decided to purchase the LeafFilter system.

86.     Prior to purchasing the LeafFilter system, Ms. GarrettDorsey reviewed Defendant's advertisements and marketing materials (including on its website) stating, inter alia, that rainwater would pass through the LeafFilter system and not would not flow over the top, and that the LeafFilter system would not allow debris to accumulate.  At no point was Ms. GarrettDorsey informed about any defects associated with the LeafFilter system that allow substantial amounts of rainwater to overflow the gutters and debris to accumulate.

87.     In January and February, 2021, New Jersey experienced several substantial rain events.  During each of these heavy rains, Ms. GarrettDorsey observed rain flowing over the LeafFilter system.  She called Defendant about the overflow. In March 2021, a LeafFilter representative came to her house and told her that the LeafFilter system looked good and that it

was properly installed.  The representative said there was nothing else to do about the overflow problem although he did install a vertical shield over a small portion of the gutter above the front door to prevent the overflowing water from accumulating near the front door.

88.     The LeafFilter defect, as well as Defendant's failure to disclose the defect to consumers, has caused the Plaintiff GarrettDorsey and class members to suffer ascertainable damages including, but not limited to, the purchase price of LeafFilter system or, alternatively, the difference in value between the LeafFilter system as advertised and the LeafFilter system as actually sold.

89.     The characteristics of the above-described LeafFilter defect were present in the LeafFilter system when the product left the factory.

90.     Had Defendant disclosed that the LeafFilter system was defective and caused rainwater to overflow the during moderate to heavy rains, Plaintiff GarrettDorsey would not have purchased the LeafFilter system, or would have paid substantially less for the product.

**BRIAN AND THERESA DERING (the "Dering Plaintiffs")**

91.     In early 2019, the Dering Plaintiffs researched and compared the advantages and disadvantages of different gutter systems on the internet.  They specifically wanted a gutter system to avoid having to clean their gutters as they had done in the past.

92.     Prior to purchasing the LeafFilter system, the Dering Plaintiffs reviewed Defendant's advertisements and marketing materials (including on its website) stating, inter alia, that rainwater would pass through the LeafFilter system and not flow over the top, and that the LeafFilter system would not allow debris to accumulate.  At no point were the Dering Plaintiffs informed about any defects associated with the LeafFilter system that allow substantial amounts of rainwater to overflow the gutters and debris to accumulate.

20

93.     In or about May 2019, after reviewing Defendant's marketing materials on its website, the Dering Plaintiffs called Defendant's phone number to schedule a time to have Defendant's sales agent come to the Dering Plaintiffs' home.

94.     On or around June 11, 2019, the Dering Plaintiffs purchased the LeafFilter system from Defendant's Pennsylvania location, LeafFilter North of Pennsylvania, LLC, for $3,539. The contract states "includes lifetime transferable warranty and no clog money back guarantee." At the time of purchase, on the basis of Defendant's representations, the Dering Plaintiffs believed the LeafFilter system to be of premium quality and worthy of the high price.

95.     Unbeknownst to the Dering Plaintiffs, the LeafFilter system was and is defective in that it (1) allows rainwater to flow over the top of the LeafFilter system; and (2) allows debris to accumulate on top of the LeafFilter system.

96.     After their purchase, the Dering Plaintiffs registered their warranty on Defendant's website.[28]

97.     The characteristics of the above-described LeafFilter defect were present in the LeafFilter system when the product left the factory.

98.     After the LeafFilter system was installed on the Dering Plaintiffs' home, the Dering Plaintiffs noticed that the LeafFilter system caused rainwater to overflow the gutters, rather than go into and through the gutters themselves as Defendant advertised.  Additionally, the Dering Plaintiffs noticed that the debris would collect on the LeafFilter system screens.

99.     In or about September 2019, the Dering Plaintiffs called Defendant's customer service and support number (800-749-4566) to report the overflow issue. A representative of Defendant subsequently visited the Dering Plaintiffs' home to inspect the LeafFilter system on

---

[28] https://www.leaffilter.com/register#step1 (last visited 12/2/20).

September 27, 2019 and told the Dering Plaintiffs that he had "adjusted" the LeafFilter system. However, the "adjustment" did not fix the problem and water continued to overflow the gutters and debris continued to collect on the screens.

100. In or about December 2020, the Dering Plaintiffs called Defendant again to complain about the continuing overflow issue. A representative of Defendant visited the Dering Plaintiffs' home on December 11, 2020 and told the Dering Plaintiffs that the screens needed cleaning – a service that cost $89. The Dering Plaintiffs protested that they purchased the LeafFilter system specifically to avoid having to clean their gutters. Although the representative told the Dering Plaintiffs that he had cleaned the debris from the LeafFilter screens, the Dering Plaintiffs have not received a bill for the service. However, water continues to overflow the Dering Plaintiffs' home's gutters and debris continues to collect on the LeafFilter system screens.

101. The LeafFilter defect, as well as Defendant's failure to disclose the defect to consumers, has caused the Dering Plaintiffs and class members to suffer ascertainable damages including, but not limited to, the purchase price of LeafFilter system or, alternatively, the difference in value between the LeafFilter system as advertised and the LeafFilter system as actually sold.

102. Had Defendant disclosed that the LeafFilter system was defective, caused rainwater to overflow the during moderate to heavy rains, and required regular cleaning, the Dering Plaintiffs would not have purchased the LeafFilter system, or would have paid substantially less for the product.

**ALAN AND SANDY ARMSTRONG (the "Armstrong Plaintiffs")**

103. The Armstrong Plaintiffs originally saw a LeafFilter advertisement on television, which led them to Defendant's website, which they reviewed. The Armstrong Plaintiffs

subsequently contacted Defendant for more information, and Defendant sent a representative to the Armstrong Plaintiffs' home.  The Armstrong Plaintiffs were particularly interested in a gutter system to avoid having to regularly clean their gutters as they had done in the past.

104.    Prior to purchasing the LeafFilter product, the Armstrong Plaintiffs reviewed Defendant's website and marketing materials stating, inter alia, that rainwater would pass through the LeafFilter system and not flow over the top, and that the LeafFilter system would not allow debris to accumulate.  At no point were the Armstrong Plaintiffs informed about any defects associated with the LeafFilter system that allow substantial amounts of rainwater to overflow the gutters and debris to accumulate.

105.    On or around May 20, 2020, the Armstrong Plaintiffs purchased the LeafFilter system from Defendant's Washington location, LeafFilter North of Washington, LLC, for $3,866.10. The contract states that it includes a "Lifetime, transferable, money back no clog guarantee." At the time of purchase, on the basis of Defendant's representations, the Armstrong Plaintiffs believed the LeafFilter system to be of premium quality and worthy of the high price.

106.    Unbeknownst to the Armstrong Plaintiffs, the LeafFilter system was and is defective in that it (1) allows rainwater to flow over the top of the LeafFilter system and gutters; and (2) allows debris to accumulate on top of the LeafFilter system.

107.    After their purchase, the Armstrong Plaintiffs registered their warranty on Defendant's website.[29]

108.    The characteristics of the above-described LeafFilter defect were present in the LeafFilter system when the product left the factory.

---

[29] https://www.leaffilter.com/register#step1 (last visited 12/2/20).

109.    Shortly after the LeafFilter system was installed, the Armstrong Plaintiffs noticed that the LeafFilter system caused rainwater to overflow the gutters, rather than go into and through the gutters themselves as Defendant advertised.  This overflow had never happened before. Additionally, the Armstrong Plaintiffs noticed that debris – especially tree needles -- would collect on the LeafFilter system screens.

110.    The Armstrong Plaintiffs have contacted Defendant on multiple occasions about the overflow and debris issues, but Defendant has not resolved the problems. Ultimately, the Armstrong Plaintiffs paid another gutter company to remove the LeafFilter system.

111.    The LeafFilter defect, as well as Defendant's failure to disclose the defect to consumers, has caused the Armstrong Plaintiffs and class members to suffer ascertainable damages including, but not limited to, the purchase price of LeafFilter system or, alternatively, the difference in value between the LeafFilter system as advertised and the LeafFilter system as actually sold.

112.    Had Defendant disclosed that the LeafFilter system was defective and caused rainwater to overflow the during moderate to heavy rains, the Armstrong Plaintiffs would not have purchased the LeafFilter, or would have paid substantially less for the product.

**E.    Defendant's Knowledge of the LeafFilter Defect**

113.    Prior to Plaintiffs' purchase, Defendant knew or should have known that its LeafFilter system contains a defect that causes rainwater to overflow the LeafFilter system during moderate or heavy rains and causes debris to accumulate on top of the LeafFilter system.

114.    Based on its accumulated experience and knowledge of consumer complaints about the defect, as well as its knowledge and history of LeafFilter's design and manufacturing, Defendant knew or should have known that it was receiving and would continue to receive

complaints and reports of water overflow and/or debris accumulation as a result of the defect.

115.    As further evidence of Defendant's knowledge of the defect, the internet is flooded

with consumer complaints:

- Product is not as described, product causing overflow off gutters causing mold on front door step, now gutters leaking every foot or so…[30](10/4/19)

- Few weeks [after installation] we had rains and the filters stopped the water from entering gutters and overflowed. *** Meanwhile, several areas in the outer wall of the house have developed moss due to moisture on them.[31] (10/3/18)

- Water was overflowing the entire length of my front porch, GUSHING over the same front corner gutter. The back patio had even worse GUSHING rain into the foundation and on my paver patio. I took videos and called to ask them to remove the product.[32] (1/8/18)

- The pitch was good. The goal of not ever cleaning another gutter was terrific. The installation was quick and it looked good. But then the rains came. Anything on the roof, we have pine needles, flowed right down to the nice little ledge of the Leaffilter. What didn't stop there continued down the side of our gutters. What did stop, and didn't come over the edge, clogged up the gutter from on top! So, now I still have to get up on my roof to clean the mess. I wish I had read this before swallowing their pitch. If you live where you don't get stuff on your roof, then why would you need this product? For us it was a waste of several thousand dollars.[33] (9/16/19)

- Do not but Leaf Filter gutter guards: Trust your instincts, this filter is too fine, it clogs on everything from pollen to dust, the roof shingle debris, cotton wood seeds. The filter needs cleaning more often than your gutter ever would. Do not purchase this product.[34] (7/24/19)

- I recently had a service call to clean out the leaf filter gutters on the front of my home. The service person was honest with me about the $95 service call cost that I was not told about when I called the company so he did not charge me. That was the only good thing that happened because he told me their is no warranty past the first year even though I was told it was a lifetime warranty when I purchased them. This is a quote from the info pages I have that is not even close to the truth: "Your competitors say 'No product can keep out pine needles, oak tassels, maple tree helicopters, or shingles grit.' Is this true? LeafFilter does guaranteed." I had little maple trees growing in my filters and will need to clean them

---

[30] https://www.bbb.org/us/il/lombard/profile/gutter-guards/leaffilter-north-of-illinois-llc-0654-88382507/complaints
[31] https://www.bbb.org/us/il/lombard/profile/gutter-guards/leaffilter-north-of-illinois-llc-0654-88382507/complaints
[32] https://www.bbb.org/us/il/lombard/profile/gutter-guards/leaffilter-north-of-illinois-llc-0654-88382507/complaints
[33] https://www.roof.info/gutter-guards/reviews/leaf-filter/
[34] https://www.roof.info/gutter-guards/reviews/leaf-filter/

myself or be charged. I cannot clean them myself anymore, that is why I trusted the leafilter system when i purchased it.[35] (7/27/19)

- After installing Leaf Filter, our gutter problem is much worse than before. After our complaining, they sent someone out to fix, but only made matters worse. The water pours off our roof. We live amongst pine trees. Maybe it works in deciduous areas. We wasted $5000.[36] (7/17/19)

- First I wish I could attach photos I have of my home. Leaf Filter told me I would no longer have to clean my gutter and would not have to be concerned about gutters clogging again. They did not make a false statement. The Leaf Filter guards stopped all the Pine needles from getting into my gutters. The pine needle were stopped on the guards and the water could not enter my gutters. I am now having to clean the Leaf filter guard so the rain water can enter into my gutters. Seems that I traded one problem for another as I am now back to cleaning my leaf filter guard.[37] (7/8/19)

- This is not what the salesman insinuated when he sold me this system. I specifically ask about the top getting debris on it and he said it will blow right off. (It doesn't). If not they come out to clean them. What he didn't say was that's only for a year. After that its tough ####. Why the first year but not after that? Do the trees around me magically decide not to drop any seed pods or leaves after that? Oh they will come clean off the top, for a $95 service call. Service dept tells me the guarantee is only to clean the gutter itself. It will never need that since it can't get through all the blockage on top. As 3 different contractors friends warned me, none of these gutter guards work but I was stupid enough to spend thousands of dollars anyway......[38] (6/13/19)

- Debris from the trees stay on the filter so the rain water does not go into the gutter but runs over the edge of the gutter. I will now have to pay someone to clean the leaf filter. What a waste of money.[39] (5/29/19)

- For the last year and a half, I've been contacting Leaffilter regarding the clogging of their gutter guards. I had them put on the entire house. Front of house has no trees, yet we have rivers of water flowing, mostly at front door and side of home where we had to put rocks to disperse the water. In the back where we have pine trees, I've taken videos of rivers pouring from the guard gutters. I've had Leaffilter employees come 4 or 5 times to fix problem. I bought a ladder and climbed recently to remove debris. The whole idea with Leaffilter was to not have to do this on my own. I'm too old for this. I have documentation in videos of front and back from 2018 and 2019. I want my money back and I want them

---

[35] https://www.roof.info/gutter-guards/reviews/leaf-filter/
[36] https://www.roof.info/gutter-guards/reviews/leaf-filter/
[37] https://www.roof.info/gutter-guards/reviews/leaf-filter/
[38] https://www.roof.info/gutter-guards/reviews/leaf-filter/
[39] https://www.roof.info/gutter-guards/reviews/leaf-filter/

to remove the gutter guards. They did not work for me. Everything was under 1st year of warranty and warranty is for life.[40] (4/20/19)

- The screen that covers the plastic, is absolutely no good, the holes are to small, which makes the water bead up and inturn, runs off the cover. Also tiny particles will eventually clog these small holes. The covers lay flat on top of the gutters, which will collect leaves, branches, ect.,which will need to be cleaned off.[41] (3/5/19)

- Salesman was great, installer was great, but, the gutter system does not perform as claimed. Leaves and oak debris still stick to and pile up on the screens and cause back flow and flooding in new areas of my home. Also when I contacted LeafFilter to come over and clean the screens, they did the job and then told me there was a $90 service charge! That was a surprise! I refused to pay it. Nowhere in the paperwork does it mention a service charge.[42] (3/4/19)

- The gutters and guards are not working, allowing water to run over the front of the gutters and then weeping back on the bottom of the gutters and dumping that water at the homes foundation.[43] (9/23/20)

- The system was installed in December of 2019 and has not functioned as advertised from the beginning. Every time it rains, which it does here in the Pacific Northwest quite often, the system would clog and the water would just pour over the gutter, pool under the roofing tabs and run down the facial boards.[44] (8/27/20)

- Days after the installation, when it started to rain, we noticed and documented with photographs and videos that the rainwater passed over the gutter in several places.[45] (9/17/20)

- [W]hen we have medium intensity rain there is still big overflows. What I have noticed that since the gutter covers are not very good in handling anything more than a light rain, in sections of my roof line where there is only a small section of gutter, there is always an overflow.[46] (9/16//20)

- I contracted with this company in June 2019 to have gutter filters installed which were done. We began having problems with them around April of May of this year as we noticed that water was overflowing the gutters.[47] (9/14/20)

---

[40] https://www.roof.info/gutter-guards/reviews/leaf-filter/
[41] https://www.roof.info/gutter-guards/reviews/leaf-filter/
[42] https://www.roof.info/gutter-guards/reviews/leaf-filter/
[43] https://www.bbb.org/us/oh/hudson/profile/gutter-guards/leaffilter-north-llc-0272-132954203/complaints
[44] https://www.bbb.org/us/oh/hudson/profile/gutter-guards/leaffilter-north-llc-0272-132954203/complaints
[45] https://www.bbb.org/us/oh/hudson/profile/gutter-guards/leaffilter-north-llc-0272-132954203/complaints
[46] https://www.bbb.org/us/oh/hudson/profile/gutter-guards/leaffilter-north-llc-0272-132954203/complaints
[47] https://www.bbb.org/us/oh/hudson/profile/gutter-guards/leaffilter-north-llc-0272-132954203/complaints

- It's been raining for a few days. It's just pouring over the gutters! I have called them many times to contact them (very hard to get through) and this product is not what they said it would be, I'm not impressed at all.[48] (9/12/20)

- Product totally misrepresented. Gutter overflowing after installation. Salesman said 100% money back guarantee. Had to call twice for service. Said I would get a call in 48 hours. After 4 days called again. Salesman wrong about dams. Conflicting info from salesman, installer and service rep. Salesman said leaves and debris would not stick—-wrong. Just like guards I had replaced they plug on top. Now they explain that 100% money back guarantee is only for plugging below guards in gutter or downspout. So I am back to water running over top of guards. Wasted thousands of dollars. I was misled.[49] (11/5/20)

116. Additionally, there are newspaper investigative journalism articles on LeafFilter's water runoff defect. For example, NewJersey.com did an article on LeafFilter purchaser Gail Van Prooien, who won a $18,000 judgment against LeafFilter.[50] In July 2016, the LeafFilter product was installed, but immediately Van Prooien reported that, "rain simply ran over the gutters rather than through them, pouring down all around the home as if there were no gutters at all."[51] Because none of the rain runs through the LeafFilter product, Van Prooien has to clear water buildup on her front and back steps to prevent icing in the winter.[52]

117. Upon information and belief, once consumers complain about the LeafFilter defect, Defendant enters into confidential settlement agreements with consumers, which requires the consumer to promise not to disparage/ further disparage the LeafFilter system through online message or complaint boards such as the BBB, yelp, Facebook, Instagram, Twitter, YouTube, and other consumer information websites and social media platforms, as a condition of removal and refund. Thus, Defendant knowingly and intentionally prevents potential purchasers of the LeafFilter system from learning about the defect by censoring consumer complaints on websites

---

[48] https://www.bbb.org/us/oh/hudson/profile/gutter-guards/leaffilter-north-llc-0272-132954203/complaints
[49] https://www.roof.info/gutter-guards/reviews/leaf-filter/
[50] https://www.nj.com/business/2018/11/company_skips_out_on_18k_court_judgment_by_changin.html
[51] *Id.*
[52] *Id.*

and social media platforms.

118.    Thus, Defendant knew or should have known that: (a) there existed a substantial risk of water overflow  and/or debris accumulating on top of the LeafFilter system; (b) Defendant's customers were unaware of that risk, and (c) Defendant's customers had a reasonable expectation that Defendant would timely disclose that risk and cure the latent defect.

119.    Despite its exclusive knowledge, Defendant did not disclose to prospective purchasers that: (a) LeafFilter contains a defect causing overflow and debris accumulation; and (b) Defendant cannot repair the defect in the product.

120.    Plaintiffs and class members reasonably expect that their LeafFilter systems will allow water to enter the gutter system in sufficient amounts to prevent overflows and not allow debris to accumulate, and Plaintiffs and class members reasonably had no expectation that the LeafFilter system would suffer from the defect.

121.    Defendant's Limited Lifetime Warranty is specifically crafted so as to not cover the defect.  Indeed, the only condition covered by the Limited Lifetime Warranty is an internal clog:  "If at any time the LeafFilter Gutter Protection System allows the interior of your gutter to clog with debris causing your gutter to fill with water and overflow, LeafFilter North LLC ("LeafFilter"), the company that distributes LeafFilter, will provide replacement product or refund you 100% of the material purchase price for ALL LeafFilter materials installed on your home."

122.    However, the defect does not cause the interior of a gutter to become clogged with debris, but rather reduces the ability of the water to enter the gutter and permits debris to accumulate on top of the LeafFilter system.  As Defendant asserts, "With LeafFilter, your gutter covers will act like a lid on a box."[53]  Obviously, if LeafFilter truly functions like a lid on a box,

---

[53] https://www.leaffilter.com/blog/home-exteriors/roofing-gutters/gutter-protectors-really-work/ (site last visited 12/2/20).

as Defendant claims, it would prevent water from entering the gutter and provide a surface for debris to accumulate. Therefore, Defendant's warranty is essentially worthless – a fact it tries to spin in a positive light in its marketing materials: "Not once has LeafFilter had to refund money to a homeowner because of a clogged gutter."

## CLASS ALLEGATIONS

123.     Plaintiffs seek to bring this case as a class action, pursuant to Rule 23 of the Federal Rules of Procedure. The proposed class (the "Class") is defined as follows:

> All persons in the United States who purchased LeafFilter during the applicable limitations period.

Plaintiffs also seek to represent a subclass (the "Ohio Law Subclass"), defined as follows:

> All persons in the United States who purchased LeafFilter during the applicable limitations period after utilizing Defendant's website to request an estimate and/or register their Limited Lifetime Warranty.

The Zilinsky Plaintiffs also seek to represent a subclass (the "Illinois Subclass"), defined as follows:

> All persons in the state of Illinois who purchased LeafFilter during the applicable limitations period.

The Simpson/ McGinley Plaintiffs also seek to represent a subclass (the "Maryland Subclass"), defined as follows:

> All persons in the state of Maryland who purchased LeafFilter during the applicable limitations period.

Plaintiff GarrettDorsey also seeks to represent a subclass (the "New Jersey Subclass"), defined as follows:

> All persons in the state of New Jersey who purchased LeafFilter during the applicable limitations period.

The Dering Plaintiffs also seek to represent a subclass (the "Pennsylvania Subclass"), defined as follows:

> All persons in the state of Pennsylvania who purchased LeafFilter during the applicable limitations period.

The Armstrong Plaintiffs also seek to represent a subclass (the "Washington Subclass"), defined as follows:

> All persons in the state of Washington who purchased LeafFilter during the applicable limitations period.

Expressly excluded from the Class and Subclasses are: (a) any Judge or Magistrate presiding over this action and members of their families; (b) Defendant and any entity in which Defendant has a controlling interest, or which has a controlling interest in Defendant, and its legal representatives, assigns and successors; and (c) all persons who properly execute and file a timely request for exclusion from the Class.

124.    Plaintiffs reserve the right to amend the Class and Subclass definitions if further investigation and/or discovery indicates that the Class and Subclass definitions should be narrowed, expanded, or otherwise modified.

## Rule 23(a) Criteria

125.    **Numerosity.** At this time, the exact number of Class members is unknown as such information is in the exclusive control of Defendant. However, due to the nature of the trade and commerce involved and the number of sales offices across the country, Plaintiffs believe the Class consists of thousands of consumers, geographically dispersed throughout the United States, making joinder of all Class members impracticable. The number and identities of Class members are administratively feasible and can be determined by Defendant's records available through appropriate discovery.

126. **Commonality.** Common questions of law and fact affect the right of each Class member and common relief by way of damages is sought for Plaintiffs and Class members, including:

        a.     Whether Defendant's LeafFilter system contains the latent defect alleged herein;

        b.     Whether Defendant had actual or imputed knowledge of the defect but failed to disclose it or falsely represented that it did not exist;

        c.     Whether Defendant's sale of LeafFilter with knowledge that it suffers from the latent defect constitutes consumer fraud or unfair and/or a deceptive trade practice; and

        d.     Whether Plaintiffs and Class members have been damaged by Defendant's conduct, and if so, what is the proper measure of such damages?

127. **Typicality.** The claims and defenses of the representative Plaintiffs are typical of the claims and defenses of the Class because they all purchased the defective LeafFilter system. Plaintiffs have suffered damage of the same type and the same manner as the Class they seek to represent and are similarly affected by Defendant's failure to disclose the defective nature of the LeafFilter system. There is nothing unique about Plaintiffs' claims. Indeed, Plaintiffs' claims are typical of the claims of other class members who purchased the same defective product.

128. **Adequacy of Representation.** The representative Plaintiffs will fairly and adequately assert and protect the interests of the Class:

        a.     Plaintiffs have hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Class; and

      b.     Plaintiffs understand their duties as class representatives, have suffered damage as a result of their purchase of the defective LeafFilter system, and have no conflict of interest with the class members they seek to represent.

### **Rule 23 (b)(3) Criteria**

129.   A class action provides a fair and efficient method for the adjudication of this controversy for the following reasons:

      a.     The common questions of law and fact set forth herein predominate over any questions affecting only individual Class members.

      b.     While the Class is so numerous that joinder is impracticable, the claims are simple enough that the manageability problems will not exist.  There are no unusual legal or individual factual issues that would create manageability problems.

      c.     Despite the costly nature of the LeafFilter product, the claims of the individual Class members are, nevertheless, small in relation to the expenses of individual litigation, making a Class action the only procedural method of redress in which Class members can, as a practical matter, recover.

      d.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendant, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action would

achieve substantial economies of time, effort, and expense, and would assure uniformity of decisions as to persons similarly situated without sacrificing procedural fairness.

**Applicable Statutes of Limitations are Tolled**
**Due to Defendant's Fraudulent Concealment**

130.    At all relevant times, Defendant affirmatively concealed from Plaintiffs and the Class the defect alleged herein.

131.    Defendant had a duty to inform Plaintiffs and the Class of the defect described herein, of which it knew or should have known.  Notwithstanding its duty, Defendant never disclosed the defect to Plaintiffs or the Class; rather, upon information and belief, Defendant settled quietly with homeowners who complained about the system and required them to sign non-disclosure agreements.

132.    Despite exercising reasonable diligence, Plaintiffs and Class could not have discovered the defects or Defendant's scheme to avoid disclosure of the defect. The defect and information that appraised, or should have appraised, Defendant of the defect were in Defendant's exclusive access and control. Thus, the applicable statutes of limitations have been tolled with respect to any claims that Plaintiffs or the Class have brought or could have brought as a result of the unlawful and fraudulent course of conduct described herein.

133.    Defendant is further estopped from asserting any limitations defense, statutory, equitable, contractual or otherwise, to the claims alleged herein by virtue of its acts of fraudulent concealment.

**CAUSES OF ACTION**

A.    **Claims Brought on Behalf of the Ohio Law Subclass**

## COUNT I
## OHIO CONSUMER SALES PRACTICES ACT
### (Ohio Rev. Code §§ 1345.01, Et Seq.)

134.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

135.    Plaintiffs bring this claim on behalf of themselves and all similarly situated individuals in the Ohio Law Subclass.

136.    Plaintiffs and Ohio Law Subclass members utilized Defendant's website to request an estimate and/or register their warranties, and Defendant's website incorporates uniform terms of use providing that "rights and obligations shall be governed by and interpreted in accordance with the law of the State of Ohio…."[54]

137.    Plaintiffs and Ohio Law Subclass members are "consumers" as defined by the Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01 ("CSPA"). Defendant is a "supplier" as defined by the CSPA. Plaintiffs' and the Ohio Law Subclass members' purchases of the LeafFilter system were "consumer transactions" as defined by the CSPA.

138.    By failing to disclose and actively concealing the defect in the LeafFilter system, misrepresenting that it "allows as much water as an open gutter," misrepresenting that rainwater would run directly through the LeafFilter product without overflow, and mispresenting that debris would not accumulate on top of the LeafFilter system, Defendant engaged in deceptive business practices prohibited by the CSPA, including engaging in acts or practices which are unfair, misleading, false, or deceptive to the consumer.

139.    Plaintiffs and Ohio Law Subclass members relied on the misrepresentations and material omissions in deciding to purchase of the defective LeafFilter system.

---

[54]  https://www.leaffilter.com/terms-of-use/ (site last visited 12/2/20).

140.    Additionally, Defendant committed an unconscionable act or practice in connection with the sales of the LeafFilter under Ohio Rev. Code § 1345.03(b) because Defendant represented that the LeafFilter "allows as much water as an open gutter," that rainwater would flow directly through the LeafFilter product without overflow, and that debris would not accumulate on top of the LeafFilter system, which Plaintiffs and Subclass members were likely to rely on to their detriment. Moreover, Defendant knew at the time that Plaintiffs and Ohio Law Subclass members purchased the LeafFilter system that they were unable to receive a substantial benefit from the purchase because of the defect in the LeafFilter system.

141.    Defendant knew that the LeafFilter product possessed a latent defect, would fail to channel the rainwater as intended and would permit debris to accumulate, and is not suitable for its intended use because Defendant:

    i.    Possessed exclusive knowledge of the defect;

    ii.    Intentionally concealed and failed to disclose in its marketing and sales materials the defect associated with the LeafFilter product; and

    iii.    Made incomplete representations about the characteristics and performance of the LeafFilter system generally, while purposefully withholding material facts from Plaintiffs that contradict these representations.

142.    Defendant's unfair and/or deceptive acts or practices were likely to, and did in fact, deceive reasonable consumers, including Plaintiffs and Ohio Law Subclass members, about the true performance and characteristics of Defendant's LeafFilter system.

143.    Plaintiffs and Ohio Law Subclass members would not have purchased the LeafFilter system absent Defendant's misrepresentations and omissions if the true facts had been known before or at the time of purchase.

144.    The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of Defendant in this Complaint, including, but not limited to, the making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-disclosure of a defect, constitute deceptive sales practices in violation of the CSPA. These cases include, but are not limited to, the following:

a. *State ex rel. Nancy H. Rogers v. The Gutter Champ, LLC* (OPIF#10002747a);

b. *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

c. *State ex rel. Betty D. Montgomery v. Defendant Motor Co.* (OPIF #10002123);

d. *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

e. *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

f. *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Oho App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

g. *State ex rel. Jim Petro v. Craftmatic Organization, Inc.* (OPIF #10002347);

h. *Mark J. CrawDefendant, et al. v. Joseph Airport Toyota, Inc.* (OPIF #10001586);

i. *State ex rel. William J. Brown v. Harold Lyons, et al.* (OPIF #10000304);

j. *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524);

145.    As a result of its violations of the CSPA detailed above, Defendant caused actual damages to Plaintiffs and Ohio Law Subclass members, including, but not limited to, the purchase price of LeafFilter system or, alternatively, the difference in value between the LeafFilter system as advertised and the LeafFilter system as actually sold.

146.    Accordingly, Plaintiffs and the Ohio Law Subclass are entitled to damages and other relief as provided under the CSPA.

147. Plaintiffs and Ohio Law Subclass members further seek court costs and attorneys' fees as a result of Defendant's knowing violation of the CSPA. Ohio Rev. Code Ann. §1345.09(F).

## COUNT II
## BREACH OF IMPLIED WARRANTY IN TORT
### (On Behalf of Ohio Law Subclass)

148. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

149. Plaintiffs bring this claim on behalf of themselves all other similarly situated individuals in the Ohio Law Subclass

150. Defendant's LeafFilter system contains a latent defect that causes water to routinely run over the top of the LeafFilter system and outside of the gutter altogether, and debris to accumulate on top of the LeafFilter system, which defeats the intended and marketed purpose of the LeafFilter system, as detailed herein.

151. The defect described herein existed at the time the LeafFilter system left Defendant's control.

152. Based upon the defect, Defendant failed to meet the expectations of a reasonable consumer. The LeafFilter system fails its ordinary, intended use because the LeafFilter product does not function as a reasonable consumer would expect because rainwater does not run through it, and instead runs over the top of the LeafFilter system and outside the gutter altogether, and the supposedly maintenance free LeafFilter system allows debris to accumulate.

153. The defect in the LeafFilter system was the direct and proximate cause of economic loss to Plaintiffs and Ohio Law Subclass members including, but not limited to, the purchase price of LeafFilter system or, alternatively, the difference in value between the LeafFilter system as advertised and the LeafFilter system as actually sold.

**B.** **Claims brought on behalf of the Illinois Subclass**

## COUNT III
## ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
## 815 ILCS 505/1 *et seq.*

154.    The Zilinsky Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

155.    The Zilinsky Plaintiffs bring this claim on behalf of themselves all other similarly situated individuals in the Illinois Subclass.

156.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* ("ICFA") protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

157.    The ICFA prohibits any unlawful, unfair, or fraudulent business acts or practices including the employment of any deception, fraud, false pretense, false promise, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact.

158.    The ICFA applies to Defendant's conduct as described herein because it protects consumers in transactions that are intended to result, or which have resulted, in the sale of goods or services.

159.    Defendant is a "person" as defined by 505/1(c).

160.    The Zilinsky Plaintiffs and the Illinois Subclass members are "consumers" as defined by 505/1(e) because they purchased merchandise—the LeafFilter system—for their own use.

161.    Defendant's LeafFilter system is "merchandise" as defined by 505/1(b) and its sale is considered "trade" or "commerce" under the ICFA.

162.    Defendant violated the ICFA by concealing material facts about its LeafFilter system. Specifically, Defendant omitted and concealed (1) that the LeafFilter system reduces the

ability of rainwater to pass into gutters, thereby causing water to pass over the gutters, and (2) that the LeafFilter system permits debris to accumulate.

163.     Defendant's failure to disclose the defect is material to the transactions here. Had the Zilinsky Plaintiffs and the Illinois Subclass known the true characteristics and behavior of the LeafFilter system, they would not have purchased the LeafFilter system or would have paid substantially less for it.

164.     Defendant intentionally concealed the LeafFilter system's defect because it knew that consumers would not otherwise purchase LeafFilter.  Indeed, Defendant's concealment of such facts was intended to mislead consumers.

165.     Defendant's concealment, suppression, and omission of material facts was likely to mislead reasonable consumers under the circumstances, and thus constitutes an unfair and deceptive trade practice in violation of the ICFA.

166.     Thus, by failing to disclose and inform Plaintiffs and the Illinois Subclass about the overflow defect, Defendant violated section 505/2 of the ICFA.

167.     As a direct and proximate result of these unfair and deceptive practices, the Zilinsky Plaintiffs and each Illinois Subclass member have suffered damages including, but not limited to, the purchase price of LeafFilter system or, alternatively, the difference in value between the LeafFilter system as advertised and the LeafFilter system as actually sold.

168.     As such, the Zilinsky Plaintiffs and the Illinois Subclass seek an order awarding (1) actual damages and (2) reasonable attorney fees and costs.

**C.     Claims brought on behalf of the Maryland Subclass**

**COUNT IV**
**VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT**
**(MD. CODE COM. LAW § 13-101, ET SEQ.)**

40

169.    The Simpson/ McGinley Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

170.    This claim is brought on behalf of the Maryland Subclass.

171.    Defendant and the Simpson/ McGinley Plaintiffs are "persons" within the meaning of Md. Code Com. Law § 13-101(h).

172.    The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale or lease of any consumer good. Md. Com. Law Code § 13-303.  Defendant participated in misleading, false, or deceptive acts that violated the Maryland CPA.  By systematically concealing the defects in the LeafFilter system, Defendant engaged in deceptive business practices prohibited by the Maryland CPA.  These defects were material to a reasonable consumer.

173.    Defendant's actions, as set forth above, occurred in the conduct of trade or commerce.

174.    In the course of its business, Defendant concealed the defects in the LeafFilter system as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the LeafFilter system.

175.    Defendant knew that the LeafFilter system was not suitable for its intended use. Defendant was previously provided notice of the defects in the LeafFilter system by numerous customer complaints, letters, emails and other communications.  Defendant nevertheless failed to disclose these defects to the Simpson/ McGinley Plaintiffs and Maryland Subclass despite having

a duty to do so.

176.    By failing to disclose and by actively concealing the defects in the Simpson/ McGinley Plaintiffs' and Maryland Subclass members' LeafFilter system, which it marketed as of high quality, Defendant engaged in unfair and deceptive business practices in violation of the Maryland CPA.

177.    Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including the Simpson/ McGinley Plaintiffs and Maryland Subclass members, about the true nature and capabilities of the LeafFilter system.

178.    Defendant intentionally and knowingly omitted material facts regarding the LeafFilter system with the intent to mislead the Simpson/ McGinley Plaintiffs and Maryland Subclass.

179.    Defendant's concealment of the defects in the Simpson/ McGinley Plaintiffs' LeafFilter system was material to the Simpson/ McGinley Plaintiffs.

180.    Defendant knew or should have known that its conduct violated the Maryland CPA.

181.    Defendant owed the Simpson/ McGinley Plaintiffs and Maryland Subclass a duty to disclose the true nature and capabilities of the LeafFilter system because Defendant:

a.      Possessed exclusive knowledge about the defects in the LeafFilter system;

b.      Intentionally concealed the defect; and/or

c.      Made incomplete representations about the true nature and capabilities of the LeafFilter system.

182.    As a result of Defendant's conduct, the Simpson/ McGinley Plaintiffs and Maryland Subclass members suffered damages including, but not limited to, the purchase price of LeafFilter system or, alternatively, the difference in value between the LeafFilter system as

42

advertised and the LeafFilter system as actually sold. The Simpson/ McGinley Plaintiffs and Subclass members were deprived of the benefit of their bargain since the LeafFilter systems they purchased were worth less than they would have been if they were free from defects. Had the Simpson/ McGinley Plaintiffs and Subclass Members been aware of the defects in the LeafFilter system, they would have either not have bought the LeafFilter system or would have paid less for it.

183.     Pursuant to Md. Code Com. Law § 13-408, the Simpson/ McGinley Plaintiff seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

**D.     Claims brought on behalf of the New Jersey Subclass**

**COUNT V**
**VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT**
**(N.J.S.A. § 56:8-1, ET SEQ.)**

184.     Plaintiff GarrettDorsey incorporates by reference all preceding allegations as though fully set forth herein.

185.     This claim is brought on behalf of the New Jersey Subclass.

186.     Plaintiff GarrettDorsey and Defendant are "persons" within the meaning of New Jersey Consumer Fraud Act ("CFA").

187.     Defendant sells "merchandise," as defined by N.J. Stat. Ann. § 56:8-1(c) and (e).

188.     At all relevant times material hereto, Defendant conducted trade and commerce in New Jersey and elsewhere within the meaning of the CFA.

189.     The New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq*., prohibits unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation, as well as the knowing concealment, suppression, or omission of any material fact with the intent that others rely on the concealment, omission, or fact, in connection with the

sale or advertisement of any merchandise.

190. The CFA is, by its terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes.

191. Defendant's practices violated the CFA for, inter alia, one or more of the following reasons.

      a. Defendant concealed from Plaintiff GarrettDorsey and the New Jersey Subclass the material fact that the LeafFilter system was defective.

      b. Defendant engaged in unconscionable commercial practices in failing to disclose material information discussed above about the LeafFilter system.

192. Defendant knew that the LeafFilter system was not suitable for its intended use. Defendant was previously provided notice of the defects in the LeafFilter system by numerous customer complaints, letters, emails and other communications. Defendant nevertheless failed to warn the Plaintiff GarrettDorsey and the New Jersey Subclass members about these defects despite having a duty to do so.

193. By failing to disclose and by actively concealing the defects in Plaintiff GarrettDorsey's and the New Jersey Subclass members' LeafFilter system, which it marketed as of high quality, Defendant engaged in unfair and deceptive business practices in violation of the CFA.

194. Defendant's concealment of the defects in the LeafFilter system was material to Plaintiff GarrettDorsey and the New Jersey Subclass members.

195. Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff GarrettDorsey and the New Jersey Subclass members, about the true nature and capabilities of the LeafFilter system.

196.    Defendant intentionally and knowingly omitted material facts regarding the LeafFilter system with the intent to mislead the Plaintiff GarrettDorsey and the New Jersey Subclass.

197.    Defendant knew or should have known that its conduct violated the CFA.

198.    As alleged above, Defendant also made material statements about the true nature and capabilities of the LeafFilter system that were either false or misleading.

199.    Defendant owed Plaintiff GarrettDorsey and the Subclass a duty to disclose the true nature and capabilities of the LeafFilter system because Defendant:

a.      Possessed exclusive knowledge about the defects in the LeafFilter system;

b.      Intentionally concealed the foregoing from the Plaintiff GarrettDorsey and the New Jersey Subclass; and/or

c.      Made incomplete representations about the true nature and capabilities of the LeafFilter system.

200.    Because Defendant fraudulently concealed the defects in the LeafFilter system, Plaintiff GarrettDorsey and New Jersey Subclass members suffered damages including, but not limited to, the purchase price of LeafFilter system or, alternatively, the difference in value between the LeafFilter system as advertised and the LeafFilter system as actually sold. Plaintiff GarrettDorsey and New Jersey Subclass members were deprived of the benefit of their bargain since the LeafFilter systems they purchased were worth less than they would have been if they were free from defects.  Had Plaintiff GarrettDorsey and Subclass Members been aware of the defects in the LeafFilter system, they would have either not have bought the LeafFilter system or would have paid less for it.

201.    Plaintiff GarrettDorsey and the New Jersey Subclass members seek actual

damages, attorneys' fees, and any other just and proper relief available under the CFA.

**E.     Claims brought on behalf of the Pennsylvania Subclass**

**COUNT VI**
**VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND**
**CONSUMER PROTECTION LAW**
**(73 P.S. § 201-1, ET SEQ.)**

202.    The Dering Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

203.    This claim is brought on behalf of the Pennsylvania Subclass.

204.    Defendant's business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, et seq. ("PUTPCPL").

205.    At all relevant times, the Dering Plaintiffs and all members of the Pennsylvania Subclass were "consumers" within the meaning of the PUTPCPL, 73 P.S. § 201-1.

206.    Defendant's conduct, as set forth herein, occurred in the conduct of a sale within the meaning of the PUTPCPL, 73 P.S. § 201-1.

207.    The practices of Defendant, described above, violate the PUTPCPL for, inter alia, one or more of the following reasons:

a.    Defendant engaged in unconscionable commercial practices in failing to reveal material facts and information about the LeafFilter system, which did, or tended to, mislead the Dering Plaintiffs and the Pennsylvania Subclass members about facts that could not reasonably be known by the consumer;

b.    Defendant failed to reveal facts that were material to the transactions in light of representations of fact made in a positive manner;

c.    Defendant caused the Dering Plaintiffs and the Pennsylvania Subclass members to

suffer a probability of confusion and a misunderstanding of legal rights, obligations and/or remedies by and through its conduct;

d. Defendant failed to reveal material facts to the Dering Plaintiffs and the Pennsylvania Subclass members with the intent that the Dering Plaintiffs and the Pennsylvania Subclass members rely upon the omission;

e. Defendant made material representations and statements of fact to the Dering Plaintiffs and the Pennsylvania Subclass that resulted in the Dering Plaintiffs and the Pennsylvania Subclass members reasonably believing the represented or suggested state of affairs to be other than what they actually were;

f. Defendant intended that the Dering Plaintiffs and the other members of the Pennsylvania Subclass rely on its and omissions, so that the Dering Plaintiffs and other Pennsylvania Subclass members would purchase the LeafFilter system; and

g. Under all of the circumstances, Defendant's conduct in employing these unfair and deceptive trade practices was malicious, willful, wanton and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

208. Defendant's actions impact the public interest because the Dering Plaintiffs and members of the Pennsylvania Subclass were injured in exactly the same way as thousands of others purchasing LeafFilter systems as a result of and pursuant to Defendant's generalized course of deception.

209. The Dering Plaintiffs and the Pennsylvania Subclass suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealments, misrepresentations, and/or failure to disclose material information. As a result of Defendant's conduct, the Dering

Plaintiffs and Pennsylvania Subclass members suffered damages including, but not limited to, the purchase price of LeafFilter system or, alternatively, the difference in value between the LeafFilter system as advertised and the LeafFilter system as actually sold. The Dering Plaintiffs and Pennsylvania Subclass members were deprived of the benefit of their bargain since the LeafFilter systems they purchased were worth less than they would have been if they were free from defects. Had the Dering Plaintiffs and Pennsylvania Subclass members been aware of the defects in the LeafFilter system, they would have either not have bought the LeafFilter system or would have paid less for it.

210. Defendant is liable to the Dering Plaintiffs and Pennsylvania Subclass members for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Defendant's unfair and deceptive practices, and any other just and proper relief.

## F. Claims brought on behalf of the Washington Subclass

### COUNT VII
### VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT
### (WASH. REV. CODE ANN. §§ 19.86.010, ET SEQ.)

211. The Armstrong Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

212. This claim is brought on behalf of the Washington Subclass.

213. Defendant is a "persons" within the meaning of the Washington Consumer Protection Act ("WCPA"), Wash. Rev. Code § 19.86010(1), and conducts "trade" and "commerce" within the meaning of the WCPA, Wash. Rev. Code § 19.86.010(2).

214. The Armstrong Plaintiffs and the Washington Subclass members are "persons" within the meaning of the WCPA, Wash. Rev. Code § 19.86.010(1).

215. Defendant's conduct described throughout this Complaint is unfair and deceptive

within the meaning of the WCPA, Wash. Rev. Code § 19.86.010, et seq. The unfair and/or deceptive practices include but are not limited to the following:

a.  failing to reveal material facts and information about the LeafFilter system, which did, or tended to, mislead the Armstrong Plaintiffs and the Washington Subclass members about facts that could not reasonably be known by them;

b.  failing to reveal facts that were material to the transactions in light of representations of fact made in a positive manner;

c.  causing the Armstrong Plaintiffs and the Washington Subclass members to suffer a probability of confusion and a misunderstanding of legal rights, obligations and/or remedies by and through its conduct;

d.  failing to reveal material facts to the Armstrong Plaintiffs and the Washington Subclass members with the intent that the Armstrong Plaintiffs and the Washington Subclass members rely upon the omission;

e.  making material representations and statements of fact to the Armstrong Plaintiffs and the Washington Subclass that resulted in the Armstrong Plaintiffs and the Washington Subclass members reasonably believing the represented or suggested state of affairs to be other than what they actually were; and

f.  intending that the Armstrong Plaintiffs and the other members of the Washington Subclass rely on its and omissions, so that the Armstrong Plaintiffs and other Washington Subclass members would purchase the LeafFilter system.

216.    Defendant engaged in these unfair acts or deceptive practices in the conduct of its business.

217.    The acts and practices described above are unfair because these acts or practices

(1) have caused substantial financial injury to the Armstrong Plaintiffs and the Washington Subclass members; (2) are not outweighed by any countervailing benefits to consumers or competitors; and (3) are not reasonably avoidable by consumers.

218.    Defendant's unfair acts and practices impact the public interest. Defendant committed the acts and practices in the course of its everyday business; the acts and practices are part of a pattern or generalized course of business; Defendant committed the acts and practices repeatedly and continually both before and after the Armstrong Plaintiffs and Washington Subclass members' purchases; there is a real and substantial potential for repetition of Defendant's conduct; and many customers are affected or likely to be affected.

219.    As a result of Defendant's conduct, the Armstrong Plaintiffs and the Washington Subclass have suffered damages including, but not limited to, the purchase price of LeafFilter system or, alternatively, the difference in value between the LeafFilter system as advertised and the LeafFilter system as actually sold.  The Armstrong Plaintiffs and Subclass Members were deprived of the benefit of their bargain since the LeafFilter systems they purchased were worth less than they would have been if they were free from defects.  Had the Armstrong Plaintiffs and Washington Subclass members been aware of the defects in the LeafFilter system, they would have either not have bought the LeafFilter system or would have paid less for it.

220.    On behalf of himself and other members of the Washington Subclass, the Armstrong Plaintiffs seeks to enjoin Defendant's unlawful acts and practices described herein, to recover their actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

**G.    Claims brought on behalf of the Class**

**COUNT VIII**
**FRAUD AND FRAUDULENT CONCEALMENT**

221.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

222.    Plaintiffs bring this claim on their own behalf, and on behalf of the Class.

223.    Plaintiffs assert claims under the law of fraudulent concealment of the forty-two states in which Defendant operates, which are materially the same under the laws of each state.

224.    During the relevant time period, Defendant knew of the defect in its LeafFilter system but continued to represent that it was of the highest quality and was suitable for its ordinary use, without disclosing the defect to Plaintiffs or Class members.

225.    In doing so, Defendant intentionally concealed the known defect, or acted with reckless disregard for the truth, and denied Plaintiffs and Class members information that is highly relevant and material to their purchasing decision—that the LeafFilter system reduces the ability of rainwater to pass into gutters and causes rainwater to pass over the LeafFilter system, and that debris accumulates on top of the LeafFilter system.

226.    Defendant had a duty to disclose this material defect because it consistently marketed its LeafFilter system as described above. Once Defendant made representations to the public about the high quality of its product and that the product was fit for its intended use, Defendant was under a duty to disclose the omitted facts, because where one does speak, one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

227.    In addition, Defendant had a duty to disclose the omitted material facts because they were known and/or accessible only to Defendant which has superior knowledge and access to the facts, and Defendant knew they were not known to or readily discoverable by Plaintiffs and

the Class. The omitted facts were material because they directly impact the quality of the LeafFilter system. Whether a gutter screen prevents water from entering the gutter is a material concern directly related to quality. Whether a supposedly maintenance free product requires a customer to climb a ladder to clear accumulated debris is a material concern related directly to quality. Defendant possessed exclusive knowledge of the defect rendering the LeafFilter system of a lesser quality than claimed or of lesser quality than similar gutter screens/ guards.

228.    Defendant actively concealed and/or suppressed these material facts, in whole or in part, with intent to induce Plaintiffs and the Class to purchase the LeafFilter system at a higher price that did not take into account the defective nature of this product.

229.    The concealment of this defect was material because if it had been disclosed, Plaintiffs and Class members would not have bought the LeafFilter system and/or not have paid as much as they did.

230.    The representations were material because they were facts that would typically be relied on by a person purchasing a gutter screen/ guard. Defendant knew its representations were false because it was aware that the LeafFilter system reduced the ability of rainwater to enter a gutter, thereby causing water to pass over the LeafFilter system, and permitted debris to accumulate on top of the LeafFilter system.  Defendant intentionally made false or misleading statements in order to sell its LeafFilter.

231.    Plaintiffs and Class members relied on Defendant's affirmative misrepresentations and omissions in deciding to purchase LeafFilter systems.

232.    Defendant still has not made full and adequate disclosure and continues to defraud Plaintiffs and the Class.

233.    Plaintiffs and the Class were unaware of these omitted material facts and would not

have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Class's actions were justified, as Defendant was in exclusive control of the material facts and such facts were not generally known to the public or the Class.

234.    As a result of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage, including but not limited to the difference between the actual value of that which Plaintiffs and the Class paid and the actual value of that which they received.

235.    Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class members' rights and well-being for the purpose of enriching Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

236.    As a result of their reliance, Plaintiffs and Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or diminished value of their LeafFilter system.

## COUNT IX
## UNJUST ENRICHMENT

237.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

238.    Plaintiffs bring this claim on their own behalf, and on behalf of the Class.

239.    Plaintiffs and Class members paid substantial money for a high-quality, high-end, no maintenance gutter screen/ guard, and, in exchange, Defendant provided Plaintiffs and Class members with a defective LeafFilter system. Thus, Plaintiffs and Class members conferred benefits upon Defendant, and Defendant had knowledge of these benefits. As described throughout this Complaint and as alleged below, retention of these benefits by Defendant under the

Case: 2:20-cv-06229-MHW-KAJ Doc #: 19 Filed: 04/01/21 Page: 54 of 56 PAGEID #: 137

circumstances present here is unjust without payment to Plaintiffs and the Class members.

240. As a result of Defendant's wrongful and fraudulent acts and omissions, as set forth above, pertaining to the defect of the LeafFilter system and the concealment of the defect, Defendant received a higher price for the sale of its LeafFilter system than the product's true worth, and Defendant obtained money which rightfully belongs to Plaintiffs and the Class.

241. As such, Plaintiffs conferred a benefit and/or windfall on Defendant, which knows of the windfall and has retained such benefits, which would be unjust for Defendant to retain.

242. Defendant appreciated, accepted, and retained the non-gratuitous benefits conferred by Plaintiffs and the Class, who, without knowledge of the defect, paid a higher price for the LeafFilter system, which actually had lower values, if any value. Accordingly, it is inequitable and unjust for Defendant to retain this wrongfully obtained money.

243. As a direct and proximate result of Defendant's unjust enrichment, Plaintiffs have suffered various damages and request restitution of all amounts by which Defendant was unjustly enriched.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and Subclasses of persons described herein, pray for an Order containing the foregoing declarations and:

A.    Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a) and (b)(3);

B.    Designating Plaintiffs as representatives of the Class and their counsel as Class counsel;

C.    Entering judgment in favor of Plaintiffs and the Class and Subclass members and against Defendant for Counts I -IX;

D.      Awarding Plaintiffs and Class members damages, attorneys' fees, costs, and interest thereon;

E.      Granting such further relief as the Court deems just.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

DATED: April 1, 2021                Respectfully submitted,

*/s/ Jeffrey S. Goldenberg*
Jeffrey S. Goldenberg (0063771)
Todd B. Naylor (0068388)
**GOLDENBERG SCHNEIDER, LPA**
4445 Lake Forest Drive, Suite 490
Cincinnati, OH 45242
Telephone: (513) 345-8291
Facsimile: (513) 345-8294
Email: jgoldenberg@gs-legal.com
       tnaylor@gs-legal.com

Janet R. Varnell*
Matthew Peterson*
Brian Warwick*
**VARNELL & WARWICK**
1101 E. Cumberland Avenue
Suite 201H, #105
Tampa, FL  33602
Telephone: (352)753-8600
Email: jvarnell@varnellandwarwick.com
       mpeterson@varnellandwarwick.com
       bwarwick@varnellandwarwick.com

* Admitted *Pro Hac Vice*

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 1, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Jeffrey S. Goldenberg*
Jeffrey S. Goldenberg